IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

ANTHONY SCOTT FABRIZIO                                                            PLAINTIFF

v.                             Civil No. 08-5215

SHERIFF KEITH FERGUSON;
DR. HUSKINS; CAPTAIN
HUNTER PETRAY; and
MAJOR GENE DRAKE                                                                  DEFENDANTS

**REPORT AND RECOMMENDATION OF THE MAGISTRATE JUDGE**

The Plaintiff, Anthony Scott Fabrizio (hereinafter Fabrizio), filed this civil rights action pursuant to 42 U.S.C. § 1983. He proceeds *pro se* and *in forma pauperis*.

Fabrizio is currently an inmate of the Arkansas Department of Correction (ADC). The events at issue in this action occurred while Fabrizio was incarcerated in the Benton County Detention Center from July 23, 2007, until his release on November 15, 2007. Specifically, he contends he was denied adequate medical care.

Defendants filed a summary judgment motion (Doc. 24). To assist Fabrizio in responding to the summary judgment motion, a questionnaire was propounded (Doc. 37) by the Court. Fabrizio filed a timely response to the questionnaire (Doc. 38).

**Background**

On July 22, 2007, Fabrizio was involved in a domestic dispute with his wife, Erica Fabrizio. *Plaintiff's Response* (Doc. 38)(hereinafter *Resp.*) at ¶¶ 1-5. During the dispute, Fabrizio alleges he punched his wife's car. *Id.* at ¶ 5. Fabrizio and his friend Ryan left and went to the emergency room because they believed Fabrizio had broken his wrist or hand. *Id.* at ¶¶ 5-6(B).

Fabrizio did not see the doctor or get any medical attention. *Resp.* at ¶ 6(B). They left the hospital because "we had been drinking and did not want to get arrested." *Id.* Fabrizio returned to the house and his wife later informed officers that Fabrizio had head-butted her, attempted to strangle her, grabbed her by the wrist and arm, and with a knife in his hand threatened to kill her if he ever caught her with another guy. *Defts' Ex.* 1 at pages 2-3. Officer Kevin Cizerle of the Bentonville Police Department requested a warrant for Fabrizio's arrest for aggravated assault of a family member, terroristic threatening, false imprisonment, and domestic battery. *Resp.* at ¶ 9.

On July 23rd, Fabrizio was booked into the Benton County Detention Center (BCDC). *Resp.* at ¶ 10. At booking, Fabrizio completed a medical questionnaire and listed no health problems other than "broken hand - Sunday night." *Id.* at ¶ 14(A). While he was being booked, Fabrizio asked for medical care and was told he would see a doctor in the morning. *Id.* at ¶¶ 14(B)-14(C). Fabrizio indicates he did not see a doctor the following morning. *Id.* at ¶ 14(C).

On July 24th, Fabrizio submitted a medical request asking to be seen because of a broken hand. *Resp.* at page 31. Fabrizio's medical chart indicates he was seen on July 24th by Nurse Smith at the request of Sergeant Vaughn. *Defendants' Exhibit* (hereinafter *Defts' Ex.*) 2 at page 7. She noted his right hand was swollen and that the injury occurred prior to his arrest. *Id.* She notified Dr. Huskins of the situation and he said he would see Fabrizio the following day. *Id.*

On July 25th, Fabrizio submitted a grievance stating he had not received help for his broken hand. *Resp.* at ¶ 15(A). Captain Petray responded, "I will forward this to medical. The doctor makes the medical decisions in this jail." *Id.*

That same day, Fabrizio was examined by Dr. Huskins who noted Fabrizio had a "possible

broken hand." *Resp.* at ¶ 16; *Defts' Ex.* 2 at pages 7 & 18. Dr. Huskins referred Fabrizio to the Ozark Orthopaedics and the first available appointment was made for him on August 2nd. *Id.*

On July 27th, Fabrizio was seen by Nurse Smith. *Defts' Ex.* 2 at page 7. He complained of hand pain and was prescribed an ice pack and Ibuprofen, every six hours as needed, for five days. *Id.*

A medication card or log was completed. *Defts' Ex.* 2 at page 12. However, there is no indication Fabrizio received this medication. *Id.*

Fabrizio was seen on August 2nd by Dr. Michael Griffey of Ozark Orthopaedics. *Resp.* at ¶ 19. The x-rays showed dislocations of Fabrizio's second through fifth carpal metacarpal joints. *Id.* Dr. Griffey referred Fabrizio to Dr. Benafield, the upper extremity specialist. *Id.* Fabrizio was to be seen by Dr. Benafield within the next day or two. *Id.*

On August 3rd, Fabrizio submitted a medical request asking to be taken to the emergency room because he had been denied proper medical attention by the jail staff. *Resp.* at page 35. He stated he had "seen a doctor who told me my injuries were very serious and would disable me for life if not properly taken care of." *Id.* He stated he had not even received one Tylenol or aspirin for his pain and was on a top bunk. *Id.*

In response, Nurse Smith wrote that there had been a medication sheet for Fabrizio for Ibuprofen in the pod for five days but he did not take any of the medication. *Resp.* at page 35. As a result, she stated the prescription was not rewritten. *Id.*

On August 3rd, Fabrizio was seen by Dr. Bryan Benafield of Ozark Orthopaedics who noted that Fabrizio's right hand had swelling and deformity and step off at the carpal metacarpal junctions of his index through the small fingers. *Resp.* at ¶ 20. The x-rays showed displaced and

foreshortenened carpal metacarpal joint dislocations of the index through the small fingers. *Id.* Dr. Benafield concluded Fabrizio "definitely needs surgical intervention"which would consist of open reduction and pinning of the joints. *Resp.* at ¶ 20; *Defts' Ex.* 4 at page 2. The procedure was to be scheduled sometime in the next week. *Id.*

On August 3rd, the jail nurse, Nurse Smith, received a call from Brenda at the Washington Regional Medical Center who requested information on payment arrangements for surgery. *Defts' Ex.* 2 at page 7. The jail nurse told her that prior to the appointment on August 2nd Fabrizio said his wife's insurance would pay for the care of his hand. *Id.*

Nurse Smith's notes indicate Fabrizio was told in the presence of Sergeants Faulkenbury and Lisenbee that the Benton County Sheriff's Office was not responsible for his medical bills. *Defts' Ex.* 2 at pages 6 & 7. She indicates Fabrizio stated he knew they were not responsible. *Id.* Fabrizio was asked if he had a insurance card, because Washington Regional Medical Center needed to know if he was going to be self-paid. *Id.* at page 7. Fabrizio again stated his wife had insurance but he didn't have a card. *Id.* at page 6. Sergeant Faulkenbury advised Fabrizio that due to a no contact order, Fabrizio could not contact his wife nor could the jail. *Id.* at page 6. Brenda, at Washington Regional, was informed of the situation, and said that she would have to get approval from her supervisor as to what to do. *Id.*

Fabrizio asserts he "never told Benton Co. I knew they weren't responsible. I told them I believe they had to do something about it. I asked to be taken to the ER or somewhere I could get it taken care of immediately and I could pay payments on since they refused to help me." *Resp.* at ¶ 21.

On August 6th, Fabrizio submitted a medical request complaining that he had been incarcerated for fifteen days and nothing had been done for his broken hand. *Resp.* at ¶ 27; *Resp.* at page 36. He asserted that the orthopedic surgeon indicated the injury was very serious and Fabrizio could lose the use of his right hand if he didn't have surgery. *Id.*

Major Drake responded: "Medical has seen you. A surgeon will not operate without ins. or cash. Your hand was broke when you came in. I will come down and talk to you." *Resp.* at page 36. Nurse Smith wrote that she would order Tylenol for his pain. *Id.*

On August 7th, the jail staff were informed by Eunice Wood, of Washington Regional Medical Center's Surgery Center, that the final decision on whether or not to operate was up to the doctor, and that she was waiting on him to let her know. *Resp.* at ¶ 22. She said that her recommendation was to cancel the surgery due to the fact there were no funds available for the procedure. *Id.*

On August 7th, Nurse Smith received a call from the Orthopedic Clinic wanting to move the surgery up, but they found out from the hospital administration that there was a payment issue. *Defts' Ex.* 2 at page 6; *Resp.* at ¶ 23 (Without knowledge to agree or disagree). Nurse Smith indicates she explained to them that Benton County is not responsible for the bill because the injury occurred prior to the arrest. *Defts' Ex.* 2 at page 6. Nurse Smith also noted the Orthopedic Clinic was trying to get insurance coverage from Fabrizio's family. *Id.*

On August 7th, Mrs. Fabrizio reported to Nurse Smith that Fabrizio was not on her insurance. *Resp.* at ¶ 24. Later that day, Beth, at Ozark Orthopedics, informed Nurse Smith that Fabrizio would have to come up with $5,800, prior to the surgery, or the surgery would be cancelled. *Resp.* at ¶ 25; *Defts' Ex.* 2 at page 6.

Two days later, on August 9th, Fabrizio was informed by Major Drake that he would have to come up with the funds in order to have the surgery on his hand. *Resp.* at ¶ 26; *Defts' Ex.* 2 at page 6. Fabrizio asserts he told them he did not have access to that kind of money and asked to be taken to the emergency room or somewhere that would bill him but treat him ASAP. *Resp.* at ¶¶ 25 & 26. He maintains the pain was unbearable. *Id.*

Fabrizio requested a copy of his medical records on August 8th regarding his broken hand and was advised to contact the medical staff. *Resp.* at ¶ 28. Fabrizio indicates the medical staff refused to give him copies of his records. *Id.*

On August 8th, Fabrizio asked if he could be transported to obtain medicaid so he could get his broken hand fixed. *Resp.* at ¶ 29. He was advised to submit a medical request regarding his hand. *Id.* At this point, Fabrizio asserts he had talked to the Captain and Major and they refused to fix his hand. *Id.*

On August 10th, Fabrizio submitted a grievance stating that his mother had told him it was a violation of his rights to not get his hand fixed. *Resp.* at ¶ 30. Petray responded, "I will forward this to medical. The doctor makes the medical decisions in this jail." *Id.*

Dr. Huskins examined Fabrizio on August 23rd and noted that he "fractured his hand prior to coming to jail. He has some deformity. He's been to the orthopedist. He's not had his hand fixed yet. We'll obtain x-rays and give him his options on treatment plans." *Resp.* at ¶ 31. While this is all true, Fabrizio states Dr. Huskins never gave him any options on treatment. *Id.*

On August 30th, Beth, with Ozark Orthopedics, informed Nurse Smith that Fabrizio's surgery was scheduled for September 4th. *Defts' Ex.* 2 at page 5; *Resp.* at ¶ 32 (Without knowledge to agree or disagree). Someone was to call to confirm payment. *Defts' Ex.* 2 at page 5.

On September 3rd, Fabrizio requested copies of his x-rays and said he needed them so he could send them to a lawyer. *Resp.* at ¶ 33. He was advised that he would need to have his lawyer get the x-rays. *Id.*

That same day, Nurse Smith informed Sergeant Barrett that Fabrizio was to have nothing by mouth after midnight because of the scheduled surgery. *Defts' Ex.* 2 at page 5. Nurse Smith noted that Fabrizio did not know about the scheduled procedure. *Id.*

On September 4th, Fabrizio was admitted to North Hills Surgery Center for treatment of carpal metacarpal dislocations of the right index, long, ring and small fingers. *Resp.* at ¶ 34; *Defts' Ex.* 4 at page 4. Dr. Bryan Benafield performed an open reduction and internal fixation of right index, long, ring and small finger. *Id.* He was discharged back to jail following the procedure and was to have follow up and suture removal in 10 days and placement in a cast. *Id.*

On September 5th, Dr. Huskins examined Fabrizio and noted that his incision was clean. *Resp.* at ¶ 35. Dr. Huskins discussed wound care with Fabrizio. *Id.* Dr. Huskins also encouraged Fabrizio to use his hands and prescribed Motrin for the inflammation. *Id.* Dr. Huskins noted that Fabrizio needed to follow up with his orthopedist. *Id.*

On September 14th, Dr. Huskins noted that Fabrizio was seen for post-op care following open reduction on his hand. *Defts' Ex.* 2 at page 22; *Resp.* at ¶ 36 (Without knowledge to agree or disagree). Dr. Huskins noted, "He's been to the orthopedic clinic for follow up. He has a cast on. Has good peripheral circulation. We'll continue with rehab." *Id.* Fabrizio asserts Dr. Huskins did not discuss rehabilitation with him and that no rehabilitation was done. *Id.* at ¶ 36.

While at the BCDC, Fabrizio was administered 500 mg of Acetaminophen four times per day from September 5, 2007, until September 14, 2007, and 500 mg of Naproxen two times per day from September 7, 2007, until September 14, 2007. *Resp.* at ¶ 40; *Defts' Ex.* 2 at pages 8-16.

Fabrizio points out that he was not given any medication for the swelling or pain in his hand when he first got to the jail. *Resp.* at ¶ 40. Fabrizio asserts this was the period of time when he most needed medication. *Id.*

Fabrizio obtained bond on November 15th from First Arkansas Bail Bonds, Inc. *Resp.* at ¶ 37. He was booked back into the BCDC on December 16, 2007, after being arrested for domestic battery III. *Resp.* at ¶ 38(A). He was released on January 11, 2008. *Id.*

On March 31, 2009, Fabrizio began serving a six year period of incarceration at the ADC. *Resp.* at ¶ 38(B). His intake physical was done on April 6th. *Defts' Ex.* 5 at page 2. The initial report of physical examination noted a deformity to top of his right hand and "weak grip to right hand." *Id.*; *Resp.* at ¶ 39. The report stated Fabrizio was in excellent physical stamina, with only slightly limited mobility in his upper extremities. *Defts' Ex.* 5 at page 1; *Resp.* at ¶ 39.

Fabrizio was asked to describe in detail how be believed Dr. Huskins exhibited deliberate indifference to his serious medical needs. Fabrizio responded:

> He did so by refusing to admit me to the hospital or provide me with the medical attention to my serious injury in a fair amount of time even though I informed him over and over. He was made aware of the situation and still refused me the treatment I needed. He would not admit me to medical housing. I was stuck on top rack with no stepping aid. I couldn't carry my tray, write, wash my body, use the bathroom or anything without someone's assistance. He also did not give me any pain reliever or anti-inflammatory and when he did he gave me a P.R.N. and didn't even notify me. I didn't even know if I had meds or when I could get them. He caused me extensive pain and suffering by neglecting me as his patient. If he would have allowed me the medical attention I needed when I needed it instead of waiting 6 weeks and letting

it heal wrong I would have full use of my right hand now and not be permanently disabled in my right hand.

*Resp.* at ¶ 41.

Fabrizio also states he was prescribed medication by both Dr. Huskins and Dr. Benafield that he did not receive. *Resp.* at ¶ 44. Additionally, he maintains Dr. Benafield ordered him to take physical therapy. *Id.*

The summary judgment record indicates Dr. Benafield, on September 4, 2007, prescribed Fabrizio Vicodin, one to two tablets to be taken every four to six hours as needed. *Defts' Ex.* 4 at page 9. Dr. Benafield also prescribed Vicodin tablets for pain on October 18th. *Resp.* at page 43. There are no medication logs indicating Fabrizio received this medication. Instead, the only jail medication logs produced dealing with the relevant time period indicate Fabrizio started receiving Acetaminophen four times a day from September 5th to September 14th and received Naproxen from September 7th to September 14th. *Defts' Ex.* 2 at pages 8-16.

On October 18th, the records from Dr. Benafield's office indicate Fabrizio was advised he could start exercising his hand. *Defts' Ex.* 4 at page 1. He was also given information on hand exercises. *Id.* at page 6.

Fabrizio asserts he talked personally to Major Drake and Captain Petray about his hand. *Resp.* at ¶ 42. He states they both had the authority to get him medical attention and did not. *Id.*

With respect to Drake, Fabrizio contends he twice looked at Fabrizio's hand and agreed that it needed medical attention. *Resp.* at ¶ 47. Fabrizio states he was told he should bond out because "his jail isn't going to pay for it or take [Fabrizio] to surgery." *Id.*

With respect to Petray, Fabrizio states he talked to him on several occasions about how serious the injury was and the pain he was in. *Resp.* at ¶ 46. Fabrizio points out Petray also received his grievances and still refused to do anything. *Id.*

He also contends he wrote Sheriff Ferguson a "few requests [pertaining] to the situation with my broken hand and how the jail staff refused to treat it." *Resp.* at ¶ 45. However, he states all requests to the Sheriff went unanswered. *Id.*

Fabrizio contends he was denied medical care as a result of a custom or policy of Benton County's. *Resp.* at ¶ 43. He maintains they refused him medical treatment because he could not afford to pay for it out of his own pocket. *Id.* Additionally, he asserts they failed to take him to the emergency room for treatment. *Id.*

Fabrizio has submitted the jail health services policy. The policy provides that "[h]ealth services will be provided for all inmates who are in need of treatment and care to reduce suffering from medical/mental problems." *Resp.* at page 46. He notes that jail medical services are enumerated to include "[r]eferral service for hospitalization and specialty clinics as needed." *Id.*

Fabrizio also asserts that the summary judgment questionnaire does not address his unconstitutional conditions of confinement claims. *Resp.* at page 31. The complaint (Doc. 1) and two supplements (Doc. 4, Doc. 13) assert only a denial of medical care claim. Fabrizio filed two motions to amend the complaint (Doc. 14, Doc. 31) and both motions were denied (Doc. 20, Doc. 36). There is no unconstitutional conditions of confinement claim in this case.

### Summary Judgment Standard

Summary judgment is appropriate if, after viewing the facts and all reasonable inferences in the light most favorable to the nonmoving party, Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,

475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986), the record "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). "Once a party moving for summary judgment has made a sufficient showing, the burden rests with the non-moving party to set forth specific facts, by affidavit or other evidence, showing that a genuine issue of material fact exists." National Bank of Commerce v. Dow Chemical Co., 165 F.3d 602, 607 (8th Cir. 1999).

The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita, 475 U.S. at 586. "They must show there is sufficient evidence to support a . . . verdict in their favor." National Bank, 165 F.3d at 607 (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)). "A case founded on speculation or suspicion is insufficient to survive a motion for summary judgment." Id. (citing Metge v. Baehler, 762 F.2d 621, 625 (8th Cir. 1985)).

## Discussion

Defendants have now moved for summary judgment. First, Defendants argue that Fabrizio was not denied adequate medical care. Second, they maintain medical malpractice or medical negligence is not actionable under § 1983. Third, they argue there is no proof of an unconstitutional custom or policy. Finally, they argue that their actions were taken in good faith and they are therefore entitled to qualified immunity.

The Eighth Circuit analyzes both a pretrial detainee's and a convicted inmate's claim of inadequate medical care under the deliberate indifference standard. See Butler v. Fletcher, 465 F.3d 340, 344 (8th Cir. 2006). To prevail on an Eighth Amendment claim, Fabrizio must prove that Defendants acted with deliberate indifference to his serious medical needs. Estelle v. Gamble, 429

U.S. 97, 106, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976). The deliberate indifference standard includes "both an objective and a subjective component: 'The [Plaintiff] must demonstrate (1) that [he] suffered [from] objectively serious medical needs and (2) that the prison officials actually knew of but deliberately disregarded those needs.'" Jolly v. Knudsen, 205 F.3d 1094, 1096 (8th Cir. 2000)(quoting Dulany v. Carnahan, 132 F.3d 1234, 1239 (8th Cir.1997)).

"For a claim of deliberate indifference, the prisoner must show more than negligence, more even than gross negligence, and mere disagreement with treatment decisions does not give rise to the level of a constitutional violation. Deliberate indifference is akin to criminal recklessness, which demands more than negligent misconduct." Popoalii v. Correctional Medical Services, 512 F.3d 488, 499 (8th Cir. 2008)(internal quotation marks and citations omitted).

In this case, the undisputed facts show that Fabrizio reported having a broken hand when he was booked into the BCDC on July 23, 2007. *Defts' Ex.* 2 at page 1; *Resp.* at ¶¶ 14(A)-14(C). He did not receive immediate medical care but was instead told he would be seen by the doctor the following day. *Resp.* at ¶ 14(C). On July 24th, Fabrizio was seen by Nurse Smith who merely noted that his right hand was swollen and he reported hitting a wall with it. *Id.* No treatment was given but Dr. Huskins was notified and advised Nurse Smith he would see Fabrizio the following day. *Defts' Ex.* 2 at page 7.

Fabrizio was seen the following day by Dr. Huskins who noted swelling and deformity of the hand. *Defts' Ex.* 2 at page 7 & 18. No pain medication or anti-inflammatory was prescribed. *Id.* An orthopedic consultation was to be scheduled. *Id.*

Fabrizio was seen by Dr. Griffey on August 2nd and it was noted that he had dislocations of his second through fifth carpal metacarpal joints. *Defts' Ex.* 4 at page 3. He was referred to Dr.

Benafield. *Id.* On August 3rd, Dr. Benafield noted that Fabrizio "definitely" needed surgical intervention. *Id.* at page 2.

That same day, Fabrizio was told by Nurse Smith, Sgt. Faulkenbury, and Sgt. Lisenbee that the Benton County Sheriff's Office was not responsible for his medical bills. *Defts' Ex.* 2 at page 7. On August 7th, Nurse Smith noted that she explained to the Orthopedic Clinic that "Benton Cty. is not responsible for bill because injury occurred prior to arrest." *Id.* at page 6. That same day, Nurse Smith was advised that Fabrizio was not on his wife's insurance. *Id.* Nurse Smith then made a notation that the orthopedic clinic advised that "Fabrizio will have to come up with $5800 prior to surg. or the procedure will be cancelled." *Id.*

Fabrizio was advised of this on August 9th by Drake. *Defts' Ex.* 2 at page 6. Nurse Smith made a notation that day that Fabrizio was unable to come up with the funds. *Id.*

Fabrizio received no further medical care until he was seen by Dr. Huskins on August 23rd. *Defts' Ex.* 2 at page 5. At that time, Nurse Smith noted in the chart that Dr. Huskins stated Fabrizio's fingers were "more dislocated than broken and could still be fixed." *Id.* No medical treatment was rendered or medication prescribed. *Id.* According to Fabrizio's chart, arrangements were made on August 30th for the surgery to be scheduled for September 4th.

"[T]he failure to treat a medical condition does not constitute punishment within the meaning of the Eighth Amendment unless prison officials knew that the condition created an excessive risk to the inmate's health and then failed to act on that knowledge." Long v. Nix, 86 F.3d 761, 765 (8th Cir. 1996). In Dulany v. Carnahan, 132 F.3d 1234 (8th Cir. 1997), the Eighth Circuit said:

> As long as this threshold is not crossed, inmates have no constitutional right to receive a particular or requested course of treatment, and prison doctors remain free to exercise their independent medical judgment. Deliberate indifference may be

demonstrated by prison guards who intentionally deny or delay access to medical care or intentionally interfere with prescribed treatment, or by prison doctors who fail to respond to prisoner's serious medical needs. *See Estelle v. Gamble*, 429 U.S. 97, 103, 97 S. Ct. 285, 290, 50 L. Ed. 2d 251 (1976). Mere negligence or medical malpractice, however, are insufficient to rise to a constitutional violation. *Id.* at 106, 97 S. Ct. at 292.

Dulany, 132 F.3d at 1239. See also Tlamka v. Serrell, 244 F.3d 628, 633 (8th Cir. 2001).

Defendants maintain that the facts, at most, establish medical negligence or medical malpractice. We disagree. Aside from the initial delay in his receipt of treatment, Fabrizio's medical chart provides strong evidence that Defendants relied on the fact that the hand injury was pre-existing in denying Fabrizio medical care. By August 7th at the latest, Defendants knew Fabrizio had no insurance and no means of paying for the surgery. Despite this, Defendants did not provide the surgery and the only record evidence regarding the necessity of the surgery is contained in Dr. Benafield's records where he concludes surgical intervention is "definitely" needed. *Defts' Ex.* 4 at page 2. The clearly established law is that:

> If a prisoner is able to pay for medical care, requiring such payment is not deliberate indifference to serious medical needs. *Helling v. McKinney,* 509 U.S. 25, 32, 113 S.Ct. 2475, 2480 (1973). Instead, such a requirement simply represents an insistence that the prisoner bear a personal expense that he or she can meet and would be required to meet in the outside world. *See, e.g., Shapley v. Nevada Bd. of State Prison Commissioners,* 766 F.2d 404, 408 (9th Cir.1985) (nothing per se unconstitutional about charging an inmate $3 for every medical visit; such a charge, by itself, did not constitute deliberate indifference under *Estelle* ). However, a prison official who withholds necessary medical care, for want of payment, from an inmate who could not pay would violate the inmate's constitutional rights if the inmate's medical needs were serious, because refusal to act pending the impossible is no different from refusing without qualification.

Moralis v. Flageole 2007 WL 2893652, 18 (C.D. Ill. 2007).

Obviously, a decision made on the basis of whether a condition pre-existed the Plaintiff's incarceration is not based on medical judgment. See e.g., Rand v. Simonds, 422 F. Supp. 2d 318

(D.N.H. 2006)(question of fact as to whether supervisors acted with the requisite degree of deliberate indifference when they relied on the fact that the plaintiff's injury was a pre-existing condition and as a result facility would not provide treatment unless plaintiff would pay for it–however, summary judgment granted supervisors because the injury did not amount to a serious medical need as a matter of law).

In this case, we also believe there is sufficient evidence in the record to create genuine issues of material fact as to the liability of Sheriff Ferguson, Captain Petray and Major Drake. As noted above, Defendants own documents suggest they had a policy of refusing to provide medical treatment for pre-existing conditions. The medical chart specifically indicates that Drake was involved in informing Fabrizio the surgery was being cancelled because he had no means of paying for it himself. *Defts' Ex.* 2 at page 6. Additionally, Drake responded to a medical request by telling Fabrizio that his hand was broken when he came in and the surgeon would not do the surgery without insurance or cash. *Resp.* at ¶ 36. Captain Petray also responded to more than one grievance in which Fabrizio asserted he was being denied medical care for his hand. *Resp.* at page 37. Fabrizio complained that he had requested medical treatment for his broken hand repeatedly. *Resp.* at page 33. In another grievance, Fabrizio indicated he had been told by the doctor that the longer he waited for the surgery the worse it would be. *Id.* at page 37.

Finally, we do not believe Defendants are entitled to qualified immunity. A reasonable detention center official would know that it is unlawful to intentionally delay medical care to an inmate with obvious physical symptoms or signs of medical distress. See e.g., Gordon ex rel Gordon v. Frank, 454 F.3d 858, 863-864 (8th Cir. 2006)("A reasonable officer would know that it is unlawful for officers to delay medical treatment for an inmate with obvious signs of medical distress,

especially one who communicates this distress directly to officers."). Additionally, the law is clearly established that "[t]he withholding of treatment for a serious medical need in order to compel payment constitutes deliberate indifference in violation of the Eighth Amendment." Benter v. Peck, 825 F. Supp. 1411, 1420 (S.D. Iowa 1993).

## Conclusion

For the reasons stated, I recommend that Defendants' motion for summary judgment (Doc. 24) be denied.

**The parties have fourteen (14) days from receipt of the report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1). The failure to file timely objections may result in waiver of the right to appeal questions of fact. The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

**DATED** this **2nd day of March 2010.**

/s/ *Erin L. Setser*
HON. ERIN L. SETSER
UNITED STATES MAGISTRATE JUDGE